UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| GIMME THE BEST, L.L.C. | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. 08-cv-2873 |
| | § | |
| SUNGARD VERICENTER, INC., | § | |
| | § | |
| Defendant. | § | |

MEMORANDUM AND ORDER

Pending before the Court is the Motion for Summary Judgment of Defendant Sungard Vericenter, Inc. (Doc. No. 18). For the following reasons, the Court finds that Defendant's Motion should be granted in part and denied in part.

I.     BACKGROUND

Plaintiff Gimmie the Best, L.L.C. is a software company that provides furniture retailers and wholesalers with software that allows them to manage their businesses online. (Def. Mot., Doc. No. 18, at 1.) Defendant Sungard Vericenter, Inc. is a "Managed Services Provider" that delivers and manages network based services, applications, and equipment to its customers. (*Id*.) In March 2003, Plaintiff and Defendant executed a contract for Defendant to provide comprehensive informational technology hardware, software, and services including, but not limited to, managed services, data centers network services, storage services, and managed server services. (Pl. Org'l Pet. ¶ 5.) This agreement included a Master Services Agreement ("MSA"), an Application Availability Service Level Agreement ("AA SLA"), and an Operational Performance Service Level Agreement ("OP SLA") ("Agreement" collectively). The term of the MSA was one year,

1

although it automatically renewed unless one party elected to terminate and gave the other party adequate notice. (Pl. Org'l Pet. ¶ 5.) According to Plaintiff, since Defendant began providing the services specified in the Agreement, Plaintiff experienced slowness in its server functions, data losses, and hardware malfunctions that caused it to incur damages for which it now seeks redress. (Jill Abrahams-Lucien Dep., Def. Mot. Ex. C, Doc. No. 18-5, 15:2-23, Nov. 11, 2009.) In December 2004, failures in both the hardware and the software provided by Defendant caused Plaintiff to permanently lose a full day's worth of data. (Abrahams-Lucien Dep. 92:22-93:7.) Around June 2006, Plaintiff learned that Defendant had provided it with pre-used hardware, meaning hardware that had been previously provided to other clients. (Abrahams-Lucien Dep. 112:14-113:1.) After several documented performance issues, the server provided by Defendant again failed in December 2006, and Defendant's backup system did not perform as intended, causing Plaintiff and Plaintiff's clients to lose a significant amount of data. (Plaintiff's Timeline of Events, Def. Ex. D.)

Plaintiff then brought this suit against Defendant, alleging breach of contract, common law fraud, and violations of the Texas Deceptive Trade Practices Act ("DTPA"). Defendant now moves for summary judgment as to all of Plaintiff's claims.

## II.    LEGAL STANDARD

A motion for summary judgment under Federal Rule of Civil Procedure 56 requires the Court to determine whether the moving party is entitled to judgment as a matter of law based on the evidence thus far presented. FED. R. CIV. P. 56(c). Summary judgment is proper "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue

as to any material fact and that the moving party is entitled to judgment as a matter of law." *Kee v. City of Rowlett*, 247 F.3d 206, 210 (5th Cir. 2001) (quotations omitted). A genuine issue of material fact exists if a reasonable jury could enter a verdict for the non-moving party. *Crawford v. Formosa Plastics Corp.*, 234 F.3d 899, 902 (5th Cir. 2000). The Court views all evidence in the light most favorable to the non-moving party and draws all reasonable inferences in that party's favor. *Id.* Hearsay, conclusory allegations, unsubstantiated assertions, and unsupported speculation are not competent summary judgment evidence. F.R.C.P. 56(e)(1); *See, e.g.*, *Eason v. Thaler*, 73 F.3d 1322, 1325 (5th Cir. 1996), *McIntosh v. Partridge*, 540 F.3d 315, 322 (5th Cir. 2008); *see also Little v. Liquid Air Corp.*, 37 F.3d 1069, 1975 (5th Cir. 1994) (noting that a non-movant's burden is "not satisfied with 'some metaphysical doubt as to the material facts.'" (citing *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986)).

## III.   VALIDITY OF THE CONTRACTUAL LIMITATIONS PROVISION

Defendant primarily argues that it is entitled to summary judgment because Plaintiff's suit violates the applicable statute of limitations. Section 8.2 of the MSA prohibits either party from bringing causes of action that relate to the MSA, "whether arising under theory of contract, tort (including negligence), strict liability or otherwise," more than two years after that cause of action accrues. (MSA, Def. Ex. 1, § 8.2.) Defendant contends that the MSA is a valid and enforceable agreement, and that the contract validly limits the time period in which any action, including the ones alleged here, can be brought.

In Texas, parties may not "enter a stipulation, contract, or agreement that purports to limit the time in which to bring suit on the stipulation, contract, or agreement to a

period shorter than two years." Tᴇx. Cɪv. Pʀᴀᴄ. & Rᴇᴍ. Cᴏᴅᴇ § 16.070(a) (2008). Here, the MSA bars only those suits that are brought *more* than two years after the cause of action accrues. Therefore, the contractual limitations provisions is valid as to the breach of contract claim.

Defendant further argues that this limitations period validly applies to all causes of action arising from or relating to the contract, including non-contractual claims sounding in tort. (Def. Mot. at 6.) This Court agrees. While it does not seem that the Texas courts have explicitly addressed the question of whether contractual limitations provisions may apply to non-contractual claims that are related to the contract at issue, several cases have treated such clauses as valid. *See, e.g.*, *Ehrig v. Germania Farm Mut. Ins. Ass'n*, 84 S.W.3d 320, 325 -326 (Tex. App.—Corpus Christi 2002, pet. denied); *Stevens v. State Farm and Casualty Co.*, 929 S.W.2d 665, 671 (Tex. App.—Texarcana 1996, pet. denied). Therefore, assuming that the MSA is a valid contract, which the parties do not appear to dispute, this Court holds that the two-year contractual limitations period applies to the breach of contract claim as well as any other claims related to the MSA.

## IV.   DOES PLAINTIFF ALLEGE SEPARATE FRAUD AND DTPA CLAIMS

In its Motion, Defendant argues not only that Plaintiff's fraud and DTPA claims are subject to the two-year contractual limitations period, but that these claims should be dismissed entirely because they are not separate and distinct from Plaintiff's breach of contract claim, that is, they are "repackaged" claims for breach of contract. (Def. Mot. at

10.) Plaintiff, however, maintains that its fraud claim is an entirely separate tort claim that should be treated as such.[1]

### A.    DTPA

Section 17.46 of the DTPA declares unlawful "(f)alse, misleading, or deceptive acts or practices in the conduct of any trade or commerce." TEX. BUS. & COMM. CODE § 17.46 (2002). However, an allegation of breach of contract, without more, does not constitute a false, misleading, or deceptive action such as would violate the DTPA. *Dura-Wood Treating Co. v. Century Forest Industries, Inc.*, 675 F.2d 745, 756 (5th Cir. 1982) (citing cases); *Ashford Development Inc. v. USLife Real Estate Serv. Corp*, 661 S.W.2d 933, 935 (Tex. 1983); *see also Rocky Mountain Helicopters, Inc. v. Lubbock County Hospital. Dist*., 987 S.W.2d 50, 53 (Tex. 1998) (noting that "we have repeatedly held that a mere breach of contract, without more, is not a DTPA violation").

In this case, Plaintiff alleges that Defendant violated the DTPA by representing that "its goods and services have . . . uses, benefits, or quantities which they do not have," that Defendant represented that its "goods [were] original or new when they were deteriorated, reconditioned, reclaimed, used, or secondhand," and that Defendant "represented that the goods or services were of a particular standard." (Pl. Org'l Pet. ¶ 12.) However, through the deposition testimony of Jill Abrahams-Lucien, Plaintiff admits that Defendant never actually told Plaintiff that it would be getting brand new equipment, but rather that the equipment would be in "good working condition." (Abrahams-Lucien Dep. 60:8-21.) Thus, Plaintiff alleges that the Defendant deceived it into thinking that the equipment it was acquiring would work properly, that is, as described in the MSA.

---

[1] Plaintiff does not, in its Amended Response, appear to address Defendant's argument that its DTPA claim should be dismissed because it is not separate and distinct from its contract claim. The Court will, nonetheless, address the merits of this argument.

(Abrahams-Lucien Dep. 61:9-23). What constitutes Plaintiff's DTPA claim, therefore, is its contention that Defendant failed to provide equipment that worked as specified under the contract. This is, in essence, a breach of contract claim. *See Helms v. Southwestern Bell Telephone Co.*, 794 F.2d 188, 189 (5th Cir. 1986) (holding that the failure of defendant to correctly print an advertisement as requested by plaintiff, absent any other allegation of misrepresentation, cannot support a DTPA cause of action); *Dura-Wood*, 675 F.2d at 756 (dismissing at DTPA claim that was premised on the fact that plaintiff "entered into the contract believing that [defendant] would perform"). Similarly, Plaintiff admitted in its deposition that all of the services that Plaintiff believed Defendant would perform were those required under the contract. (Abrahams-Lucien Dep. 63:12-16). Therefore, Plaintiff's allegations concerning Defendant's representations as to the quality of its services are also, at their core, allegations of  breach of contract. The Court therefore dismisses Plaintiff's DTPA claims as failing to state a claim separate and distinct from its breach of contract claim.

### B.    Fraud

Turning then to Plaintiff's fraud claim, Plaintiff alleges that Defendant "made a material misrepresentation to Plaintiff that it "intended to provide hardware in good working condition and competent service," and that Defendant has neither provided goods nor performed services under the contract. (Pl. Org'l Pet. ¶ 10.) "In determining whether the plaintiff may recover on a tort theory, it is also instructive to examine the nature of the plaintiff's loss. When the only loss or damage alleged by a plaintiff is the subject matter of a contract, the plaintiff's action is ordinarily on the contract." *Century Sur. Co. v. Hardscape Const. Specialties Inc.*, 578 F.3d 262, 267 (5th Cir. 2009) (citing

*Southwestern Bell Telephone Co. v. DeLanney,* 809 S.W.2d 493, 494-95 n.2 (Tex. 1991)). Failure to perform as promised, standing alone, is no evidence of fraud, although it may be considered with other facts to establish fraudulent intent. *Spoljaric v. Percival Tours, Inc.*, 708 S.W.2d 432, 435 (Tex. 1986); *see also Morgan Bldgs. and Spas, Inc. v. Humane Society of Southeast Texas*, 249 S.W.3d 480, 489 (Tex. App.—Beaumont 2008, no pet.) (noting that a fraud claim cannot be based solely on a failure to perform contractual promises). If, however, the defendant's conduct would give rise to liability independent of the fact that a contract exists between the parties, the plaintiff's claims may also sound in tort. *DeLanney*, 809 S.W.2d  at 494.

Texas law has long imposed a duty to abstain from inducing another to enter into a contract through the use of fraudulent misrepresentations. As a rule, a party is not bound by a contract procured by fraud. *Formosa Plastics Corp. USA v. Presidio Engineers and Contractors, Inc.*, 960 S.W.2d 41, 46 (Tex. 1998). Accordingly, "tort damages are recoverable for a fraudulent inducement claim irrespective of whether the fraudulent representations are later subsumed in a contract or whether the plaintiff only suffers an economic loss related to the subject matter of the contract," because an independent legal duty, separate from the existence of the contract itself, precludes the use of fraud to induce a binding agreement. *Id*. at 47. Thus, this Court must determine whether Plaintiff's fraud claim, as stated in its Petition, alleges fraud in the inducement, that is, the violation of a legal duty that is separate from the obligations under the Agreement.

The elements of fraud in the inducement are: 1) defendant made a material misrepresentation that was false, 2) defendant knew that the representation was false

when made or made it recklessly as a positive assertion without any knowledge of its truth, 3) defendant intended to induce plaintiff to act upon the representation, and 4) plaintiff actually and justifiably relied upon the representation and suffered injury as a result. *Taft v. Sherman*, 301 S.W.3d 452 (Tex. App—Amarillo 2009). Usually, successful claims of fraudulent inducement have involved confessions by the defendant or its agents of the requisite intent. *Tony Gullo Motors I, L.P. v. Chapa*,  212 S.W.3d 299, 305 (Tex. 2006).

Plaintiff argues in its Amended Response that it clearly alleges, and that the evidence supports, a claim for fraud in the inducement. (Pl. Am. Resp., Doc. No. 32, at 14-15.) In its pleadings, although Plaintiff does indeed allege that Defendant made material misrepresentations, it states that it relied on such representations by "paying monthly invoices under the contract." (Pl. Org'l Pet. ¶ 10.) Thus, at no point does Plaintiff make any statement in its pleading that Defendant's fraudulent representations actually induced it into entering in the contract. Without such allegations, Plaintiff merely states that Defendant committed fraud by failing to perform as promised under the terms of the Agreement, and that Plaintiff relied on these representations by fulfilling its own contractual obligations in making monthly payments. As established above, failure to perform as promised under the contract, standing alone, does not constitute fraud. *See Spoljaric v. Percival Tours, Inc.,* 708 S.W.2d 432, 435 (Tex. 1986).

Moreover, Plaintiff does not, through the deposition of the corporate representative, point to any specific fraudulent statement or statements made by Defendant that purportedly induced it into signing the contract. Although Plaintiff states generally that statements made by Defendant "pertained to the level of service that they

were capable of offering and the environment that we would be provided," Plaintiff offers

no evidence as to whether Defendant knew these representations to be false at the time

they were made. (Abrahams-Lucien Dep. 50:15-20.) Under the precedent cited above,

general statements about a party's intent to perform the very obligations that are later

recorded in the contract can constitute a fraud-in-the inducement claim only if the

Plaintiff offers evidence that Defendant had no such intent when these pre-contractual

negotiations took place. Otherwise, the distinction between contract and tort established

by Texas law would be virtually abolished.

In addition, the statements made by Plaintiff's corporate representative as to the

alleged defective hardware likewise do not support a claim for fraudulent inducement.

Plaintiff admitted through this deposition that Defendant did not explicitly promise

Plaintiff brand-new equipment prior to the contract, but only equipment that would be in

"good working condition." (Abrahams-Lucien Dep. 60:4-21.) Thus, in alleging that the

equipment was not in good working condition, Plaintiff does not allege that it was

fraudulently induced into signing the contract by an objectively false representation, but

rather than the equipment did not perform as it should have under the terms of the

Agreement. Accordingly, Plaintiff's fraud claim must be dismissed.

## V.      WHEN DID THE LIMITATIONS PERIOD BEGIN TO TOLL

Thus, because all that remains is Plaintiff's breach of contract claim, this Court

must determine whether this claim is barred by the applicable statute of limitations.

Defendant argues that Plaintiff's claim is barred because the evidence in this case clearly

demonstrates "that Plaintiff's breach of contract claim accrued no later than December 4,

2004," that is, significantly more than two years before this suit was filed in August 2008.

(Def. Mot. at 12.) In its Response, Plaintiff presents three arguments as to why its breach of contract claim is timely. First, Plaintiff argues that its claims for damages sustained in December 2006 are timely because Section 11.9 of the MSA provides that "the waiver of any breach or default of this MSA, of the failure to exercise any right provided for in this MSA, will not constitute a waiver of any subsequent breach, default, or right." (Def. Mot. Ex. A.) Second, Plaintiff argues that all service problems prior to December 2006 were cured within twenty-four hours, and thus, under Section C.3 of the OP SLA, no contractual default actually occurred until December 2006. Finally, Plaintiff argues that Section 8.2 of the MSA, or the contractual limitations period provision, applies only to consequential damages.

A cause of action accrues, and the statute of limitations begins to run, when facts come into existence that authorize a claimant to seek a judicial remedy. *Johnson & Higgins of Texas, Inc. v. Kenneco Energy, Inc.*, 962 S.W.2d 507, 514 (Tex. 1998); *Robinson v. Weaver*, 550 S.W.2d 18, 19 (Tex. 1977). A breach of contract claim accrues when the contract is breached. *Stein v. Stewart*, 80 S.W.3d 586, 592 (Tex. 2002). When the facts are arguably not clear enough to put the aggrieved party on notice of a legal injury, the question of whether the facts are sufficient to put the party on notice should be determined by the fact-finder. *Ehrig v. Germania Farm Mut. Ins. Ass'n*, 84 S.W.3d 320, 325-326 (Tex. App.—Corpus Christi 2002, pet. denied).

Plaintiff unequivocally states that, starting in 2003, it experienced data losses and failures that caused it damage, and that these problems form part of the basis on which it filed this suit. (Abrahams-Lucien Dep. 15:20-16:9, 92:3-13.)  Plaintiff further alleges that in December 2004, it experienced its first system failure that resulted in significant data

loss. (Def. Mot. Ex. D, Doc. No. 18-6.) It appears that the server went down on the morning of December 4, and was not restored until the next day. (*Id*., Abrahams-Lucien Dep. 92:25-93:1.) Then, in August 2006, Plaintiff lodged another complaint with Defendant, once again reporting multiple performance problems, including outages and system downtime. (Abrahams-Lucien Dep. 114:10-115:1.) Finally, in December 2006, Plaintiff experienced its most serious system failure, that resulted in significant data loss during Plaintiff's busiest season. (Def. Mot. Ex. D.)

Plaintiff alleges in its Petition that Defendant breached its contract by failing to "furnish hardware in good working condition" and to "provide the informational technology services as provided for in the contract." (Pl. Org'l Pet. ¶ 8.) This Court is tasked, therefore, with determining when in the sequence of events a cause of action accrued, that is, when the facts giving rise to the alleged contractual breach occurred. Because Plaintiff alleges injuries that span from 2003 to 2006, with the largest, and most notable failure occurring in December 2006, it is necessary to determine whether each of the problems experienced by Plaintiff represents separate and independent breach by the Defendant, or, if there was only a single breach, when such breach occurred and the statute of limitations began to run.

### A.    Multiple Breaches

There is much evidence in the record that suggests that each the problems experienced by Plaintiff did constitute a separate and independent breach of Defendant's contractual obligations. Although each failure may have manifested itself in similar ways, it appears from Plaintiff's description that each separate failure was distinct in cause, degree, and duration. (Def. Mot. Ex. D.) When describing each of these problems, the

corporate representative of Plaintiff specifically testified that "[e]ach damage was unique, but the outcome of the damages was pretty much the same, loss of business and revenues for our company."  (Abrahams-Lucien Dep. 16:17-21.) She also states that the data loss experienced in December 2006 was the "main reason" that she brought this suit. (*Id.* 14:9-19.) She further maintained that the damages experienced in December 2006 were the "worst damages." (*Id.* 16:14-18.) Indeed, that it was not until the system failure in December 2006 that Plaintiff chose to end its relationship with Defendant and bring this suit suggests that the events and systems failure of December 2006 were unique, whether in nature or degree, and constituted a wholly separate actionable set of events.

Thus, under this framework, each of the incidents in which Plaintiff experienced system failures and data loss represented a separate failure of the part of the Defendant to provide properly working hardware and informational technology services as provided under the MSA. Accordingly, any breach that occurred between March 2003 and August 28, 2006 is not actionable, because it is barred by the applicable limitations provision in the MSA. However, the failures and damages experienced by Plaintiff any time after August 28, 2006, including the December 2006 system failure, constitute a wholly separate alleged breach on the part of Defendant that is not so barred. Moreover, as Plaintiff points out in its first argument, Section 11.9 of the MSA provides that "the waiver of any breach or default of this MSA . . . will not constitute a waiver of any subsequent breach . . . ." (Def. Mot. Ex. A.) Under this provision, therefore, that Plaintiff chose not to sue when it experienced problems before August 2006 does not preclude it from later filing suit for the wholly separate and actionable breach that arose in December

2006.[2] Accordingly, Plaintiff is not prohibited under the applicable statute of limitations from bringing an action for the injuries it suffered in December 2006 as a result of Defendant's breach, as this alleged breach was well within two-years of the date this suit was filed.

**B.      Single Breach**

Moreover, even if this Court were to reject the notion that each of the events alleged by Plaintiff constituted separate and distinct breaches, the Court nonetheless cannot conclude that Plaintiff's action should be barred. Defendant argues in its Motion that Plaintiff's claim accrued, or the facts giving rise to its claim occurred, in 2003, or, at the latest, December 2004, and that the events that took place after this date were simply continuations of this initial breach. However, construing all the facts in a light most favorable to the Plaintiff, the Court is not persuaded that Plaintiff's claim did in fact accrue prior to August 2006.

First, as Plaintiff points out in its second argument, the OP SLA provides that if Defendant, after receiving notice of a default of the Agreement, proceeds to cure the default within five days and completes the cure within thirty days, no default will be deemed to have occurred. (OP SLA, Def. Mot. Ex. A, § C.3.) In this case, Plaintiff admits that, for all of the problems it experienced before December 2006, it gave notice to Defendant and Defendant addressed the problem well within thirty days. Defendant is

---

[2] This framework is consistent with recent Supreme Court jurisprudence concerning timely filing of employee discrimination claims under Title VII. In *Ledbetter v. Goodyear Tire & Rubber Co., Inc.*, 550 U.S. 618, 628 (2007), the Supreme Court acknowledged that "if an employer engages in a series of acts each of which is intentionally discriminatory, then a fresh violation takes place when each act is committed." Although recently enacted legislation has rendered the thrust of this opinion moot, this acknowledgement remains undisturbed. *See also National R.R. Passenger Corp. v Morgan*, 536 U.S. 101, 113 (2002) (noting that "[e]ach discrete discriminatory act starts a new clock for filing charges alleging that act").

correct that this provision of the OP SLA governs only certain services provided by Defendant to Plaintiff, and thus it cannot be used to validate all of the claims asserted by Plaintiff, some of which necessarily arise from obligations not covered by the OP SLA. However, the provision nonetheless suggests that at least *some* of the service breaches alleged by Plaintiff did not occur until December 2006, because prior to this date Defendant cured service issues under the OP SLA of which it had notice such that no default would be deemed to have occurred.[3]

Second, although Plaintiff did indeed experience problems of varying degrees prior to the serious system failure in December 2006, it is not clear to this Court that the magnitude of these problems was sufficient to put Plaintiff on notice that the contract had been breached. In other words, it is not clear what level of performance failure was necessary for the Agreement's terms to be violated. It strikes this Court as logical that, in contracts involving the provision of technological equipment and information technology services, some measure of system failure or data loss is permissible, and that not all such occurrences constitute a *per se* violation of the applicable contract for technology service provision. Thus, it could be that a failure of the size and magnitude of the December 2006 events was required in this case for Plaintiff to become cognizant of the fact that the failures in service provision and hardware functioning might constitute an actionable

---

[3] Defendant also objects to Plaintiff's argument that no contractual default occurred until December 2006 on the basis that it is inconsistent with Plaintiff's Petition and testimonial assertion that Defendant did in fact default on the contract in 2003 and 2004, as events occurring on these dates form part of the basis on which Plaintiff brings this suit. The Court does not, however, find Plaintiff's position to be entirely inconsistent. While it is true that Plaintiff has asserted that the problems it experienced prior to December 2006 are part of the reason that it chose to bring this suit, at no point has Plaintiff expressly taken the position that the contract was actually breached, or that Defendant defaulted as a matter of law, during this time. Moreover, that Plaintiff originally filed this suit seeking relief for all of the damages it suffered, including those prior to December 2006, does not prevent it from now, in response to Defendant's contention that its claims are time-barred, raising this alternative argument for why some of its claims for relief might be time-barred while others are not.

breach. Perhaps before this date, the degree of problems experienced by Plaintiff was insufficient to put it on notice that it had an actionable legal claim. *See Ehrig*, 84 S.W.3d at 325-326 (Tex. App.—Corpus Christi 2002, pet. denied) (holding that "when the facts are arguably not clear enough to put the aggrieved party on notice of a legal injury, the question of whether the facts are sufficient to put the party on notice should be determined by the fact-finder").   Indeed, although Defendant points out that Plaintiff identifies December 4, 2004 as the date when it experienced a hardware failure that resulted in significant data loss, Plaintiff maintained in its corporate representative deposition that the loss in December 2006 was unique and far more significant. (Abrahams-Lucien Dep. 16:14-18.)

Therefore, even if this Court does not view each of the events described by Plaintiff as separate and distinct breaches, the Court, construing all facts in a light most favorable to Plaintiff, cannot conclude that Plaintiff's breach of contract claim accrued prior to August 2006 such that its claims are barred by the applicable statute of limitations. Instead, a fact issue remains as to when the events putting Plaintiff on notice of its cause of action occurred. Accordingly, this Court concludes that Defendant is not entitled to summary judgment on Plaintiff's breach of contract claim on the asserted grounds that this claim is barred by the contractual limitations provision contained in the MSA.[4]

---

[4] Plaintiff also makes an argument in its brief that the contractual limitations provision in the MSA applies only to consequential damages because Section 8.2 is entitled "Consequential Damages Waiver." Because the Court has already concluded that Defendant is not entitled to summary judgment on the basis of this provision, it need not reach this argument. Nonetheless, the Court notes that the language of Section 8.2 of the MSA unambiguously provides that "no cause of action which accrued more than two (2) years prior to the filing of a suit alleging such cause of action may be asserted against [Defendant]." As Defendant points out, Section 11.3 of the MSA states that "[t]he article and section headings in this MSA are for reference purposes only and shall not affect the meaning or interpretation of the MSA." Therefore, that Section 8.2 is

**VI.     ARE PLAINTIFF'S DAMAGES LIMITED**

Finally, Defendant argues that, even for those of Plaintiff's claims that are not time-barred, Section 8.2 of the MSA explicitly limits Plaintiff's remedies such that it is entitled to no additional damages. Section 8.2 of the MSA states

> in no event will either party be liable or responsible to the other for any type of incidental, exemplary, special, punitive, indirect, or consequential damages, including, but not limited to, lost revenue, lost profits, replacement goods, loss of technology, rights, or services loss of data, or interruption or loss of use of service or equipment, even if advised of the possibility of such damage, whether arising under theory of contract, tort (including negligence), strict liability or otherwise. (Def. Mot. Ex. A).

Moreover, Defendant points out that Section D.2 of the AA SLA, which sets forth the remedies available to Plaintiff in the event the Defendant fails to provide service at the required level, states that Plaintiff's exclusive remedy for service failures is a "Managed Service Credit equal to partial credit of the Monthly Fee for the environment that was affected," and that this credit "shall be deemed to be liquidated damages." (AA SLA, Def. Mot. Ex. A, § D.2.) Thus, according to Defendant, to the extent that there was any breach, the only damages to which Plaintiff was entitled was a service credit, which it already received. Plaintiff argues that, because the Remedies section of the OP SLA contains no limitation on Defendant's liability in the event of a breach, the terms of these contracts conflict, and the OP SLA should control. The Remedies section of the OP SLA states that Defendant "will work with [Plaintiff] to achieve a reasonable resolution to all Support issues brought before [Defendant] in a timely manner." (OP SLA, Def. Ex. A, § C.)

---

entitled "Consequential Damages Waiver" would not mandate that the clear language contained in this section to be narrowly interpreted as Plaintiff suggests. As such, this argument is rejected.

The Court agrees with Defendant that, under the explicit terms of the MSA, the only damages to which Plaintiff is entitled are the actual damages that it sustained as a result of Defendant's alleged breach (as opposed to incidental or consequential damages). Defendant is also correct that the MSA goes on to state that failures in service provision are governed by the SLA corresponding to the service that was breached. (MSA, Def. Ex. A, § 5.2(b).) The MSA and the SLAs, therefore, work in conjunction with one another to define the full scope of the remedies available to Plaintiff under the parties' Agreement. They explicitly refer to one another. That the MSA contains a limitation on the damages available to Plaintiff that is not repeated in either SLA does not create a conflict, because the MSA refers to the SLAs as providing terms related and additional to its provisions regarding remedies. Therefore, the Court rejects Plaintiff's arguments that these documents are in conflict. Instead, the Court concludes that they work in conjunction with one another.

However, the Court cannot, on the basis of the information now before it, conclude that, as a matter of law, Plaintiff's breach of contract claim is entirely limited by the remedies set forth in the SLAs. While the MSA makes it clear that alleged deficiencies in *service provision* entitle Plaintiff only to those remedies that are set forth in the corresponding SLA, Plaintiff, in its Petition, bases its breach of contract allegations on the fact that "Defendant did not furnish hardware in good working condition, *and* did not provide informational technology services as provided for in the contract" (emphasis added). Thus, Plaintiff's claim is at least partially based not on Defendant's service provision failure, but rather on the fact that it was given defective hardware. As such, the Court cannot assume that such allegations fall within the remedies provision in the

various SLAs. Neither Defendant nor Plaintiff addresses the issue of whether Plaintiff's Petition, as it pertains to defective hardware, as opposed to defective service provision, is covered by the provisions in the MSA, one of the SLAs, or both. The Court, therefore, cannot reach a conclusion as to whether or how Plaintiff's remedies are limited for this defective hardware allegation.

Nonetheless, the Court does agree with Defendant that, to the extent that Plaintiff's breach of contract claim is based on the failure to provide adequate services, it has already received all relief to which it is entitled under the Agreement. The evidence demonstrates that Defendant did in fact take measures to correct system failures and recover data to the extent possible after the crashes that occurred in December 2004 and December 2006. It is also apparent that Plaintiff did receive service credits for the damages it sustained in these system crashes. (Def. Mot. Ex. K, L.) Therefore, to the extent that Plaintiff was entitled to damages for the breach of the service provision agreements between the parties in December 2006, under the terms of the MSA and the remedies provisions of the SLAs, Plaintiff has already received the damages to which it is entitled.

Accordingly, the Court concludes that Plaintiff is only entitled to actual damages for the alleged breach of contract that took place in December 2006. However, the Court finds that an issue remains as to whether the allegation of defective hardware is limited by the terms of the SLAs, or, conversely whether Plaintiff is still entitled to additional damages for the breach of contract claim arising from alleged defective hardware.

## V.     CONCLUSION

For the reasons set forth above, this Court concludes that Defendant's Motion for Summary Judgment (Doc. No. 18) is **GRANTED IN PART AND DENIED IN PART.**

**IT IS SO ORDERED**.

**SIGNED** at Houston, Texas, on this the 1st day of April, 2010.

_____
KEITH P. ELLISON
UNITED STATES DISTRICT JUDGE


**TO ENSURE PROPER NOTICE, EACH PARTY WHO RECEIVES
THIS ORDER SHALL FORWARD A COPY OF IT TO EVERY
OTHER PARTY AND AFFECTED NON-PARTY EVEN THOUGH
THEY MAY HAVE BEEN SENT ONE BY THE COURT**